UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

MARVIN BANKS, *et al.*,

      Plaintiff,

      v.

BRADLEY BOOHER, *et al.*,

      Defendants.

CIVIL ACTION NO. 1:24-cv-00474

(SAPORITO, J.)

## MEMORANDUM

Plaintiffs Marvin Banks, Dale Arnold, and Carl L. Varner proceed *pro se* in a fee-paid case challenging recent changes to the Pennsylvania Department of Corrections ("DOC") policies for observance of religious meals. All parties have requested summary judgment on plaintiffs' claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the First Amendment. Because the record indicates that the policy changes were reasonably related to legitimate penological interests, and the current policy does not substantially burden plaintiffs' religious exercise, the Court grants summary judgment to the defendants.

### I.   BACKGROUND

Briefly summarized, the operative complaint (Doc. 14) alleges as

follows: Plaintiffs are of Native American descent and practice Native American religious traditions, including the Green Corn Feast, held annually in August or September. The Green Corn Feast traditionally involves gathering "foods like corn, beans and squash," fishing from a river in accordance with sacred traditions, and hunting for "buffalo, deer, turkey, moose, etc.," to "provide . . . a great feast" to be eaten communally. Celebration "in the wrong manner is to bring misfortune to the creator and ancestors." Plaintiffs allege that according to their religious belief, the Green Corn Feast "must be celebrated with communal foods[. T]hese foods include meat like buffalo, deer, [and] moose," as well as fish, wild rice, corn, beans, and squash.

Prior to January 2023, the DOC accommodated certain religious groups by offering "Ceremonial Meals," along with "time [and] space in which to celebrate as a religious community." For these meals, the DOC allowed inmates to purchase religious foods from a supplemental menu. Under this prior policy, the DOC "typically" supplied buffalo, turkey, corn, beans, squash, fry bread, and fresh fruit, among other foods, for Native American religious celebrations. In January 2023, the DOC eliminated "Ceremonial Meals," and began offering "Fellowship Meals." Inmates

would select their meal from the prison menu and would no longer be permitted to purchase supplemental items. Faith groups would be permitted to eat together "and afterwards engage in [30] minutes of fellowship" if communal gatherings were permitted in the prison at that time. Plaintiffs refused to select a meal from the general menu, believing that such a choice would "shame and disrespect their religion" because "there is no other alternative to the Green Corn Feast." Plaintiffs further allege that they were not permitted to gather communally for 30 minutes as contemplated by the policy.

Following a motion to dismiss, Plaintiffs were permitted to proceed on RLUIPA claims for injunctive relief and First Amendment claims for injunctive and monetary relief against five defendants. *See* (Doc. 37). Plaintiffs have filed four different motions requesting summary judgment (Docs. 51, 56, 71, 84), and defendants have also moved for summary judgment (Doc. 62). Also before the Court are defendants' "Notice of Suggestion of Mootness," arguing that any claim for injunctive relief must be dismissed based on a March 2025 update to the meal policy (Doc. 48); plaintiff Banks's motion to strike the Notice (Doc. 49); and plaintiff Arnold's renewed requests for appointment of counsel (Doc. 72)

and preliminary injunctive relief (Doc. 76). These motions are all ripe for resolution.

## II.   LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant

must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251-52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A).

## III.   MATERIAL FACTS

The summary judgment record[1] contains the following material

---

[1] Plaintiffs' various summary judgment filings do not respond directly to defendants' statement of material facts, and cite inconsistently to supporting evidence, if at all. *See* (Docs. 51, 57, 71, 72, 84). Any factual allegations in these filings are not competent evidence at the summary
*(continued on next page)*

facts: The DOC recognizes approximately 40 different faith groups among roughly 40,000 inmates in its custody. Until January 2023, the DOC accommodated certain minority faith groups by offering Ceremonial Meals, for which inmates could purchase religious foods from external vendors to be prepared by the prison kitchen staff. Although inmates from at least 29 different faith groups have requested these Ceremonial Meals, they were only granted to three faith groups: Muslim, Jewish, and Native American. *See* (Doc. 64-1, ¶¶ 12, 20); (Doc. 64-2).

### A. Green Corn Feast

It is undisputed that plaintiffs hold "Native American"[2] religious

---

judgment stage unless supported by evidence in the record. *See* Fed. R. Civ. P. 56(c)(1). Nonetheless, in evaluating the parties' motions, the Court has reviewed and considered all the evidence the parties have submitted. *See* Fed. R. Civ. P. 56(c)(3) (in addition to properly cited materials, the court "may consider other materials in the record"). Where plaintiffs have not presented competent evidence to demonstrate a genuine dispute of material fact, defendants' fact statements are deemed admitted. *See* Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1.

[2] The Court acknowledges evidence of varied cultural and religious traditions among different Native American tribes. *See, e.g.,* (Doc. 53-4). The plaintiffs refer to the Green Corn Feast as generally arising from a "Native American" religious tradition, and the DOC classifies their religious beliefs in the same manner. *See also* (Doc. 73 at 3-4) (inmate declarations attesting that "native foods [are] a sacred Sacrament . . . held by all Native Nations"). Thus, for clarity, the Court refers to these

*(continued on next page)*

beliefs, which include observance of the ceremony they refer to as the Green Corn Feast.[3] Plaintiffs have presented evidence and argument that traditionally, observance of the Green Corn Feast included corn, beans, and squash (the "Three Sisters"), and "some meat."[4] *See* (Doc. 14-1 at 1-4; Doc. 51 at 7; Doc. 64-24 at 23). However, the DOC entertained additional requests for food that was not "required." A DOC document lists Native American inmates as having requested "Buffalo, Venison, Salmon, Indian corn/maize, beans, squash, pumpkins, sunflowers, wild rice, sweet potatoes, tomatoes, peppers, peanuts, avocados, papayas, potatoes [and] fry bread." (Doc. 64-3). A notice describing the 2015 Green Corn Feast at an unspecified prison describes a meal of "buffalo & chicken," "mashed potatoes & gravy," pinto beans, corn on the cob,

---

as Native American religious beliefs.

[3] This event is also referred to throughout the record as the "Harvest Meal" or the "Green Corn Harvest."

[4] Most of plaintiffs' evidence on this point speaks to a general entitlement to a "feast" or "Native foods" (*see, e.g.*, Doc. 1-1; Doc. 14-1 at 5-6; Doc. 57; Doc. 73), or to cultural or historical practices with no clear connection to the Green Corn Feast. *See, e.g.*, (Docs. 53-2, 53-3, 53-4). Thus, while plaintiffs have demanded a wide variety of foods for the Green Corn Feast throughout this case, *see* (n. 7), *infra*, they have not provided evidence of a religious entitlement to all of these foods.

squash, fry bread, banana nut bread, fruit salad, and "coffee/milk/water/juice." *See* (Doc. 53-7). Despite this ambiguity, it is undisputed that the Ceremonial Meals policy satisfied plaintiffs' religious requirements.

## B. Abandonment of Ceremonial Meals (January 2023-March 2025)

The Ceremonial Meals posed several challenges for the DOC. The cost of the meals, and the quantity of food needed, would change based on inmates who transferred, opted in or out, or attempted to change their religious preference in advance of the meal. This created logistical issues in providing accurate cost estimates to inmates, collecting payment, and ensuring that the right amount of food was available. An inmate who was indigent could only receive the ceremonial food if other inmates of the faith group paid for their meal, which created tension within some faith groups. In addition, prison staff had to identify appropriate vendors with the relevant items in stock; obtain and securely store the items, which were "often" stolen by inmate kitchen workers; prepare individual items in kitchens designed for bulk cooking; and address complaints about the foods or their preparation. In 2022, DOC Food Service employees spent more than 7,000 hours "on the procurement, storage, preparation, and

serving" of Ceremonial Meals at 24 different facilities, including 1,223 hours for the Native American meal; Chaplaincy and Procurement employees spent approximately 5,000 hours, including 430.5 hours on the Native American meal. *See* (Doc. 64-1, ¶¶ 18, 26-41).

Effective January 1, 2023, the DOC replaced its Ceremonial Meal policy with a more restrictive policy of "Fellowship Meals." Under this policy, a faith group could choose any meal offered on the prison menu that week, but it could not order items from outside the prison. The groups were also permitted 30 minutes for "fellowship," which could include "prayers, reading of sacred texts, singing of religious songs, etc." (Doc. 64-6). The Native American inmates at SCI-Benner Township, including all three plaintiffs[5], refused the meal and the communal gathering offered for the 2023 Green Corn Feast. *See* (Doc. 64-18 at 15). In December 2023, the policy was further amended to permit inmates to purchase a single, shelf-stable item in addition to their meal choice from the prison menu. The DOC's list of suggested items for Native American inmates consisted of various forms of jerky, and "the onus [was] on

---

[5] In 2023, plaintiffs were all incarcerated at SCI-Benner Township, but Banks has now been transferred to SCI-Fayette and Arnold to SCI-Smithfield.

inmates to suggest [additional] vendors and items which [met] DOC restrictions." *See* (Doc. 64-10).

### C. Current Religious Meals Policy (March 2025-present)

In March 2025, the DOC issued an amended Religious Meals policy, which is the policy now in force. Inmates are permitted their choice of meal from the prison menu plus "up to three outside food items from one licensed food establishment." The outside food items must be "cooked and/or prepared in ready-to-eat form that is prepared and/or provided by a licensed food establishment[,] . . . delivered to the [DOC], and served and/or distributed by the [DOC]." Alternatively, faith groups may purchase "up to three shelf stable items." Inmates are responsible for identifying the relevant items, the vendor, the manner of delivery, and the approximate cost. *See* (Doc. 48-1). Faith groups may eat communally if "operationally feasible," and plaintiffs have not disputed that they are able to meet communally under this new policy.

## IV.   DISCUSSION

### A. RLUIPA

RLUIPA forbids the government from imposing "a substantial burden" on a prisoner's religious exercise unless the government "demonstrates that imposition of the burden on that person (1) is in

furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). A substantial burden under RLUIPA exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior to violate his beliefs. *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007). Because RLUIPA can only provide injunctive relief, the Court's RLUIPA analysis is limited to the current Religious Meals policy, which permits inmates to order three items from outside sources.

Defendants are entitled to summary judgment on plaintiffs' RLUIPA claim because plaintiffs have not shown that the current policy imposes a substantial burden on their religious exercise. Plaintiffs have claimed entitlement to at least 20 different foods for the Green Corn Feast, a list that has continued to grow and change throughout this case, and which far exceeds what they had previously accepted under the

original Ceremonial Meals policy.[6] They appear to interpret the concept of a religious "feast" as entitling them to any food or condition they request that has cultural or historical significance, but that is not what RLUIPA requires.[7] Plaintiff Banks analogizes the deprivation of certain "foods that are part of our identity" to "removing tortillas from Mexican culture, or spaghetti from an Italian society." (Doc. 51 at 8). Although RLUIPA protects the exercise of an inmate's religion, it would not entitle an Italian inmate to spaghetti. Regardless, if the deprivation of a

---

[6] *See*, *e.g.*, (Doc. 14, ¶¶ 13-18) (asserting entitlement to "meat like buffalo, deer, [and] moose," as well as fish, wild rice, corn, beans, and squash"); (Doc. 49 at 2 (asserting that all foods "must be traditionally hunted in a ceremonial/tradition[al] manner")); (Doc. 57 at 15 (demanding "a full food spread of traditional foods of buffalo, brown rice, sweet potatoes, yams, beans, squash, fruit cup of strawberries, blueberries, watermelon, Indian fry bread, corn on the cob, nut bread, coffee, milk, sugar, juice, cold water, hot water" along with "turkey, [potatoes], gravy, and cake")); (Doc. 72 at 14 (demanding that the prison supply "ketchup, mustard, salt-n-pepper" and ensure that the foods are "traditional free range pure natural foods")).

[7] *See*, *e.g.*, *Roten v. Klemm*, No. 2:21-CV-0323, 2021 WL 5883160, at *5-7 (W.D. Pa. Dec. 13, 2021) ("Asatru/Odinist" plaintiff demanded a "Yule Feast" of 14 food items, but failed to establish how denial of these items impeded his religious practice); *see also Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) (not all aspects of a person's "way of life" are religious, "even if that way of life is inspired by philosophical beliefs") (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972)).

particular food would burden plaintiffs' religious practice, the current policy permits the inmates to obtain that food.[8] In his most recent filing, plaintiff Arnold describes the October 28, 2025, Religious Meal as "alright, but not what [he] was use[d] to." (Doc. 84 at 1). On this record, no reasonable juror could find that this policy imposes a substantial burden on plaintiffs' religious exercise.

To the extent plaintiffs object that they must now identify an outside vendor of Native American foods from limited options, *see*, *e.g.*, (Doc. 73 at 3-4), any difficulty in finding a vendor is not attributable to a burden "impos[ed]" by the government. The new policy broadly permits foods from any "licensed food establishment," which can include any "retail food facility" or "commercial food establishment" that is able to

---

[8] For example, a meal that includes the traditional foods of corn, beans, and squash would be available under the new policy, which allows plaintiffs three "outside" foods in addition to their choice of meal from the normal prison menu. *See* (Doc. 64-24 at 23 (plaintiff Varner's claim that "wild game, Deer, Bison, Bear, or fish can be changed . . . [but] the Green Corn Feast cannot be met" without beans, corn and squash); *see also Ali v. Harry*, No. 3:24-cv-1072-JKM (M.D. Pa. July 30, 2025) (Doc. 35) (dismissing a Muslim plaintiff's injunctive relief claims for "Halal-complaint" food as moot based on the new policy).

deliver the food. *See* (Doc. 48-1 at 4).[9] Having objected to the adequacy of the food they were provided, plaintiffs are not entitled to relief from the "burden" of choosing their own foods.

Even if plaintiffs had shown a substantial burden, defendants have shown that the current policy is the "least restrictive option" to accomplish the compelling government interest of cost containment. A prison defendant can satisfy this standard by presenting "reports, statistics, testimony, or affidavits concerning the estimated cost [of the] accommodations," showing that the savings cannot be achieved in a less restrictive manner. *See Nunez v. Wolf*, 117 F.4th 137, 155 (3d Cir. 2024); *see, e.g., Banks v. Sec'y Pennsylvania Dep't of Corr.*, 601 F. App'x 101, 106-07 (3d Cir. 2015) (affirming summary judgment on a RLUIPA claim; defendants' "cost-containment rationale serve[d] as a valid reason for rejecting . . . proposed alternatives" to a policy restricting Muslim feasts). Defendants have done so here. *See, e.g.,* (Doc. 64-1, ¶¶ 27-41; Docs. 64-2 through 64-4). The record cannot support the conclusion that the new

---

[9] Any asserted difficulty in finding a vendor under this basic constraint would only support defendants' argument that the Ceremonial Meals policy (under which Food Service workers had to identify vendors for a much broader array of foods) had become untenable.

policy violates plaintiffs' rights under RLUIPA.

### B. First Amendment

Plaintiffs also bring claims for monetary and injunctive relief under the First Amendment. Because RLUIPA's protection is broader than the First Amendment's, *see Holt v. Hobbs*, 574 U.S. 352, 361 (2015), summary judgment on the RLUIPA claim forecloses prospective injunctive relief under the First Amendment. However, the Court will consider whether the plaintiffs' First Amendment rights were violated between January 2023, when the original Ceremonial Meals policy was abandoned, and March 2025, when the newest Religious Meals policy came into force.

"Inmates clearly retain protections afforded by the First Amendment . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987). Despite the ambiguity over the scope of the Green Corn Feast, a jury could reasonably infer that plaintiffs' religious practice includes the consumption of specific foods for the Green Corn Feast, and that forcing them to eat from the prison menu constituted a limitation on their religious exercise. *See Potts v. Holt*, 617 F. App'x 148, 150 (3d Cir. 2015) ("We have long held that prisoners generally are entitled to religiously

acceptable meals.") (citations omitted).

However, a regulation limiting prisoners' religious exercise is constitutional if the record shows that it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Four factors bear on the question of whether a restriction is reasonable:

> First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational." Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at *de minimis* cost to valid penological interests."

*Waterman v. Farmer*, 183 F.3d 208, 213 (3d Cir. 1999) (quoting *Turner*, 482 U.S. at 89-90). By this standard, courts must afford substantial deference to prison administrators, who bear a "significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003) (quoting *Overton v. Bazzetta*, 539 U.S. 126 (2003)).

- 16 -

Here, the record of this case shows that the policies in force between January 2023 and March 2025, although possibly ill-advised, were not arbitrary or irrational. They were connected to the legitimate interests of a more efficient food service, limiting disputes and resentment among inmates, and achieving consistency in religious accommodations[10]. *See, e.g., Banks*, 601 F. App'x at 106-07; *DeHart*, 227 F.3d at 52.

Further, the record indicates that these plaintiffs had other means of exercising the circumscribed right. For this factor, the question is not whether plaintiffs had another way to engage in the Green Corn Feast specifically, but whether they had "alternative means of exercising [their] beliefs generally (*e.g.*, by prayer, worship, meditation, scripture study, etc.)." *See DeHart*, 227 F.3d at 54 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 417-18 (1989)). The meal policies generally permitted plaintiffs to gather communally for 30 minutes on the day of the meal, during which they could engage in activities such as "prayers, reading of sacred texts,

---

[10] A constant theme of plaintiffs' arguments is that the DOC disfavors the Native American religion, but the record shows that the Native American religion was one of only three faith groups to be granted a Ceremonial Meal. Eliminating the Ceremonial Meal policy placed Native American inmates in the same position as dozens of faith groups that requested Ceremonial Meals and were refused.

singing of religious songs, etc." *See* (Doc. 64-6 at 2; Doc. 64-9 at 4). The Court also takes judicial notice of the DOC's full "Religious Activities" policy, which permits a variety of other religious accommodations for Native American inmates.[11]

For the 2023 Green Corn Feast, Chaplain Ammon Bailey, the Native American religious advisor, advised defendant Henry Hansard that the Native American inmates were "declining to participate . . . altogether, both the meal and the ceremony."[12] (Doc. 64-18, ¶ 15). Although plaintiffs allege that Hansard refused their communal time

---

[11] *See* DC-ADM 819 ("Religious Activities"), available at http://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/819-religious-activities.pdf (last accessed February 24, 2026). Such accommodations include "primary religious gatherings" up to once per week (*see* § 1(A)(6) and Glossary); possession of a medicine bag containing sage, sweetgrass, cedar, tobacco, and corn, as a religious medallion (§ 3(A)(2)(f)); and additional sacred ceremonies, including the Communal Smudging and Sacred Pipe Ceremony, with access to related sacramental items (Attachment 3-C).

[12] This hearsay statement can be considered at summary judgment stage as evidence "capable of being admissible at trial," because "nothing suggests that [Hansard and Bailey] would be unavailable to testify." *See Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 239 (3d Cir. 2016) (citations omitted). Even if this statement were excluded, the record lacks evidence that any defendant refused plaintiffs the 30 minutes of communal time, so no reasonable jury could resolve that factual issue in plaintiffs' favor.

because they refused a meal from the prison menu, they present no evidence for that allegation. Plaintiff Banks points to Hansard's "admission" that plaintiffs never directly "inferred or stated to [Hansard]" that they were refusing the communal time (Doc. 51 at 3), but it is undisputed that Hansard received Native American inmates' religious requests through Chaplain Bailey (Doc. 64-18, ¶ 14). The fact that plaintiffs did not talk directly to Hansard is not evidence that he refused the accommodation.

Third, the Court must consider the costs of accommodating the right to the "other inmates, guards, and prison resources generally." Although defendants' evidence of cost is primarily directed to the full Ceremonial Meals, plaintiffs' religious exercise might have been accommodated by certain "religiously acceptable" foods short of that demand. Nonetheless, the evidence shows how even a less elaborate meal would pose some of the same logistical issues and potentially foster resentment among inmates. For the same reasons, the evidence shows that there is no alternative policy that "fully accommodates the prisoner[s'] rights at *de minimis* cost." *See, e.g., Williams*, 343 F.3d at 220-21 (discussing evidence that the costs associated with serving Halal

meat to Muslim prisoners "would have a marked effect on the prison community").

Because the relevant factors all suggest that any restrictions of these plaintiffs' religious rights were "reasonably related to legitimate penological interests," *Turner*, 482 U.S. at 89-90, defendants are entitled to summary judgment on this claim.

## V.    CONCLUSION

While the Court understands plaintiffs' frustration at the removal of an accommodation they had previously enjoyed, it cannot grant the relief they are seeking. The record of this case shows that the DOC's policy changes were reasonably related to legitimate purposes. The current policy, although "not what [plaintiffs are] use[d] to," allows them to purchase their own religious foods and eat communally for the Green Corn Feast. Because summary judgment is granted to the defendants, the Court need not address their arguments regarding administrative remedies, personal involvement, qualified immunity, and the availability of compensatory damages. An appropriate order follows.

Dated: February 27, 2026              *s/Joseph F. Saporito, Jr.*
                                      JOSEPH F. SAPORITO, JR.
                                      United States District Judge